UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
SOUTHEASTERN DIVISION

CAROL CHRISTOPHER,    )
    )
    Plaintiff,    )
    )
    vs.    )    Case No. 1:15-CV-110 (CEJ)
    )
CAROLYN W. COLVIN, Acting    )
Commissioner of Social Security,    )
    )
    Defendant.    )

## MEMORANDUM AND ORDER

This matter is before the Court for review of an adverse ruling by the Social Security Administration.

## I.    Procedural History

Plaintiff Carol Christopher filed applications for disability insurance benefits, Title II, 42 U.S.C. §§ 401–434, and supplemental security income, Title XVI, 42 U.S.C. §§ 1381–1385, on October 12, 2010, with an alleged onset date of July 1, 2010. (Tr. 337–49). After plaintiff's applications were denied on initial consideration (Tr. 172–73), she requested a hearing from an Administrative Law Judge (ALJ). (Tr. 209–15). Plaintiff and counsel appeared for a hearing on July 12, 2012. (Tr. 122–36). The ALJ issued a decision denying plaintiff's applications on July 25, 2012. (Tr. 175–91). On September 24, 2013, the Appeals Council reversed the ALJ's decision and remanded the case back to the ALJ to further consider plaintiff's work activity, clarify the severity of plaintiff's impairments, give further consideration to the opinion of nurse practitioner Smith, further evaluate plaintiff's mental impairments, give further consideration to plaintiff's maximum

residual functional capacity, and, if warranted, obtain supplemental evidence from a vocational expert. (Tr. 192–96).

Plaintiff and counsel appeared for a supplemental video hearing in front of an ALJ on January 8, 2014. (Tr. 137–71). Based on income issues, plaintiff amended her alleged onset date to November 1, 2011. (Tr. 515–17). The ALJ issued a decision finding plaintiff not disabled and denying plaintiff's applications on February 4, 2014. (Tr. 89–106). The Appeals Council denied plaintiff's request for review on April 10, 2015. (Tr. 1–7). Accordingly, the ALJ's decision stands as the Commissioner's final decision subject to judicial review.

## II.    Evidence Before the ALJ

### A.    Disability Application Documents

In a Disability Reported completed during an in-person interview on October 12, 2010 (Tr. 430–33), the interviewer noted that plaintiff looked very sad, stated she had lost 40 pounds in the last year due to irritable bowel syndrome (IBS), and left her assembly line job because of an IBS incident. Work History Reports plaintiff completed indicate that she worked on an assembly line 12 hours a day for one month in September 2010. This job required her to walk 10 hours a day, stand, stoop, and handle large objects two hours a day, reach six hours a day, and kneel half an hour a day. From March 2008 to August 2010, she worked as a CMT at nursing, boarding and group homes where she administered and charted medication, cooked food, cleaned rooms, and showered and dressed clients. From September 2007 to March 2008, plaintiff worked in retail. (Tr. 419–29, 434–45, 465–75). The heaviest weight she frequently lifted was 10 pounds.

In a Function Report dated October 23, 2010 (Tr. 446–56), plaintiff wrote that her daily activities included waking up, drinking coffee, using the bathroom, washing dishes, cleaning the house, taking medications, going to the unemployment office, looking for jobs on a computer, preparing food, watching television, reading, talking to friends on the phone, visiting her daughter's house, and sleeping. Plaintiff did not care for other people, but took care of a pet. Since the onset of her conditions, plaintiff wrote that she did not know when she might lose control of her bowels or have an anxiety attack. Plaintiff did not need reminders to care for her personal grooming or take medications. She prepared her own meals daily, consisting of canned foods and sandwiches. Plaintiff's household chores included cleaning, laundry, washing dishes, and taking out trash on a daily or weekly basis. She went outside every day, drove a car, and could go out alone. Plaintiff shopped for groceries every two weeks for an hour and a half each trip.

Plaintiff could independently manage her finances. However, she no longer had adequate funds to pay her bills since she stopped working full-time. Plaintiff's hobbies and interests included reading, watching television, and using a computer. She wrote that she had concentration problems, however, and did not read as often as she used to. She watched television daily. For social activities, plaintiff talked with and visited others. She did not have problems getting along with others, but was constantly afraid she would have a loss of bowel control or extreme anxiety and panic attacks. Plaintiff indicated that her conditions affected her memory and ability to concentrate. She could walk half a mile before needing to rest for fifteen minutes. Plaintiff could pay attention for fifteen minutes at a time and could follow

recipes.  She did not handle stress or changes in routine well and felt like she was dying when she experienced anxiety attacks.

In an employer questionnaire from Covenant Care Services dated July 3, 2012 (Tr. 508), plaintiff's supervisor wrote that plaintiff worked as an aide or personal assistant in a home for individuals with developmental and physical disabilities.  Plaintiff did not need special assistance or adaptations to do her job, although she had missed a significant amount of work due to hospitalization and frequent bouts of depression.  Some of plaintiff's clients were very happy with the services she provided, while others stated that plaintiff had difficulties staying on task.  She became easily confused when changes were made by her employer. Plaintiff did not have any physical limitations on her ability to work and worked well with supervisors.

In a letter dated July 4, 2012 (Tr. 486–89), plaintiff's daughter, Erin Bradley, wrote that although plaintiff had struggled with depression and anxiety for decades, her behavior and attitude had changed markedly over the past two years after her brother's death.  The most noticeable changes had been to her mother's memory and concentration.  Ms. Bradley wrote that plaintiff had made a medication error at work and lost her job.  Plaintiff also had trouble remembering her past employment and had forgotten one of her children's birthdays.  Plaintiff had failed to keep up with her utility bills and her electricity was shut off in June.

Irritable bowel syndrome also exacerbated her mother's anxiety.  Ms. Bradley expressed disbelief over the amount of weight plaintiff had lost because of IBS and described plaintiff as "rail thin."  Plaintiff had lost her job at a nursing home when she had an accident due to IBS on the way to work.  Her overall physical stamina

and strength was diminished.  When plaintiff took her dogs on a walk recently, she was unable to walk for more than a few minutes.  Previously, plaintiff had been able to go hiking on more challenging and steep trails at state parks.  Plaintiff formerly could lift people in her line of work, but no longer could lift anything heavier than groceries.  Plaintiff had struggled greatly with grief, depression, and IBS since her younger brother committed suicide last March.  Plaintiff's daughter felt powerless to help her.

In an employer questionnaire from Genesis Home Care dated December 19, 2013 (Tr. 514), plaintiff's supervisor wrote that plaintiff worked as a homemaker or certified nursing assistant at the center.  Plaintiff did not need any special assistance to do her job, did not have physical limitations on her ability to work, and did not have any issues with absences.  When plaintiff was given instructions, she needed to have things explained to her a few times, but could complete her assigned tasks.  Plaintiff worked 25 hours a week for this employer, per her request.

## B.     **Testimony at the Hearings**

### 1.     **July 12, 2012 Hearing**

At her initial hearing with an ALJ, plaintiff testified that she had an associate's degree in English.  (Tr. 125).  She stopped working full time when she had a panic attack on July 1, 2010.  Plaintiff had trouble focusing and remembering the residents or their medications.  She next worked full-time at Chateau Gerardo for nine months, but made medication errors and was terminated.  (Tr. 126).  Plaintiff presently worked part-time at Covenant Care as a certified nursing assistant.  She did not think she could work full-time, because she was not strong

enough to lift people and had constant anxiety. Plaintiff reported having anxiety since she was a child. Her mental condition became worse in 2010 because of stress from work. Quitting her job made her less stressed.

Anxiety caused plaintiff to have irritable bowel syndrome and episodes of incontinence. (Tr. 128). Anxiety also affected her memory, making it difficult for her to remember simple things. Plaintiff had anxiety attacks weekly, causing her to feel doomed and as if she was having a heart attack. These feelings lasted five to ten minutes and depleted her energy. She sometimes took Xanax if she felt a panic attack coming, which made her sleepy. Plaintiff also had battled depression since she was a child. Plaintiff's son committed suicide in 2011, and since then plaintiff had become so depressed she was hospitalized a few times. (Tr. 130). Depression made it difficult for her to get out of bed and function. She felt worthless, guilty, and depleted of energy.

Plaintiff reported irritable bowel syndrome to be a daily problem for her. Plaintiff had become incontinent at work once and had to leave and miss work. On another occasion she had an accident on the way to work and went home. Her employer fired her since she did not call in and report her absence. Plaintiff sometimes had severe pains in her stomach and became constipated. Plaintiff thought medication she was prescribed caused her to feel faint when she stood up too quickly. (Tr. 132). She had passed out and fallen on the floor when she woke up during the night to use the bathroom.

Plaintiff lived in her mother's house with her brother. Plaintiff took care of household chores such as doing the dishes and sweeping while her brother did chores outside. Plaintiff went grocery shopping, but felt overwhelmed in the store

and made impulsive purchases. She used to be sociable and go out with friends, but now felt nervous around others. She felt comfortable attending church services. For hobbies, plaintiff read and watched television, but report difficulties focusing on either.

## 2. January 8, 2014 Hearing

At a subsequent hearing before an ALJ, plaintiff testified that she had been seeing a psychiatrist, Dr. Sabapathypillai, once a month for five or six years. (Tr. 148–49). Plaintiff had been hospitalized three times for suicidal thoughts, which began after her son passed away in March 2011. (Tr. 149–50). Plaintiff took Abilify, Lyrica and Xanax for her mental health impairments. She also took medication for a diagnosed bipolar disorder. During depressive episodes, plaintiff felt like she wanted to die and found it difficult to maintain the normal activities of daily living. (Tr. 151–52). Once a month she did not get out of bed because of depression. Every day it was difficult for her to focus. She sometimes had racing thoughts and panic attacks. Twice a month she had hours-long crying spells.

Plaintiff also had had fibromyalgia for more than a decade. (Tr. 153). Her symptoms from fibromyalgia included back and arm pain and fatigue. She needed to lie down when she was tired because of fibromyalgia. Plaintiff stated that she was diagnosed with irritable bowel syndrome after she had a colonoscopy. Plaintiff used the restroom approximately ten times a day. She had accidents once a month. Stress and anxiety were triggers for her irritable bowel. Driving and filling out paperwork caused her anxiety. With respect to her memory, plaintiff reported difficulties recalling addresses, names and phone numbers. (Tr. 157). Plaintiff

stated that she had anxiety attacks once or twice a week. She would sit down to calm and collect herself.

Darrell W. Taylor, Ph.D., a vocational expert, provided testimony at the hearing. Dr. Taylor first classified plaintiff's current position as a home health attendant and past position as a certified medication technician, as medium exertional and semi-skilled positions. (Tr. 162). The ALJ asked Dr. Taylor to consider an individual of plaintiff's age, education, and work experience who is limited to medium work, simple, routine and repetitive tasks, and is unable to perform tasks requiring more than superficial interaction with the public or co-workers, meaning that the individual should deal primarily with things instead of people. Dr. Taylor opined that such an individual could not perform any of plaintiff's past relevant work. However, such a person could work medium, unskilled positions as a dishwasher, hand packer, or janitor. For a second hypothetical, the ALJ asked Dr. Taylor to further assume the individual was limited to medium work activity, but capable of performing work at the semi-skilled level. (Tr. 164). Dr. Taylor testified that such a person could perform plaintiff's past work as a home health aide or CMT, in addition to the aforementioned medium, unskilled positions.

On cross-examination, plaintiff's counsel asked the vocational expert if an individual who required redirection or retraining from a supervisor once every hour on a consistent basis would be capable of sustaining full-time work. (Tr. 166). Dr. Taylor responded in the negative, stating that this example was more representative of supported employment. In response to further questioning from plaintiff's counsel, Dr. Taylor testified that an individual who was off-task as little as

15 percent of the day on a regular or ongoing basis would soon result in termination, as he or she would be unable to meet pace and production requirements.  Counsel then asked Dr. Taylor if an individual who required one additional, unscheduled 15-minute break in addition to already-provided breaks throughout the day on a consistent and ongoing basis would be able to sustain full-time work.  Dr. Taylor opined that, particularly in the unskilled positions cited, an individual would not be afforded unscheduled breaks and would be terminated.  If an individual were to miss work twice a month on an ongoing basis, including during the probationary period, Dr. Taylor stated that such a person could not sustain full-time work.

With respect to contact with co-workers and others, Dr. Taylor testified that an individual could work without contact with the public, but would inevitably have some interaction with co-workers and supervisors.  If an individual was limited to interaction with co-workers for five percent of the day or less, Dr. Taylor opined that he or she would not have the opportunity to engage in full-time competitive employment.  If an individual needed to be located within a 30-second walk to a bathroom due to incontinence or IBS, Dr. Taylor testified that facilities may be close, but the nearest facilities would generally be farther away in unskilled positions, particularly if the bathroom breaks were unscheduled.  With respect to the "as needed" standard for an employee using the restroom, Dr. Taylor stated that such an employment condition would result in termination if the employer viewed the use as an unscheduled break.  Finally, counsel inquired as to whether a person who could lift five pounds occasionally and less than five pounds frequently, must use the toilet as needed, could sit less than one hour in total or continuously

for less than 15 minutes, and needed to lie down as needed would be able to work. Dr. Taylor responded that such a person would not be able to maintain competitive employment.

## C. Medical Records

At Heartland Family Physicians on October 28, 2009 (Tr. 526), plaintiff requested a Xanax[1] refill and an increase in her Abilify[2] prescription. Plaintiff was otherwise feeling fine and had less anxiety. Cymbalta[3] seemed to be working very well for her depression. Upon objective examination, plaintiff's blood pressure was stable and she had no dizziness or shortness of breath. The medical provider increased plaintiff's Abilify, continued Xanax, and instructed plaintiff to follow up in six months.

On November 10, 2009 (Tr. 551–52), plaintiff requested mental health services at the VA Outpatient Clinic. Initial appointments were made with Gary Helle, L.C.S.W., and Mercy Sabapathypillai, M.D. that day. It was noted that plaintiff was prescribed Cymbalta currently, but had tried selective serotonin reuptake inhibitors in the past, including Paxil, Zoloft, Wellbutrin and Prozac. Helle noted that plaintiff reported feeling depressed, had a poor appetite, had difficulty getting out of bed, and felt some anxiety. (Tr. 586–90). In the past three months, plaintiff's depression had caused memory problems, which affected her job performance. This caused her anxiety and worry. A mental status examination

---

[1] **Error! Main Document Only.**Xanax is indicated for the treatment of panic disorder. See <u>Phys. Desk Ref.</u> 2655–56 (60th ed. 2006).

[2] **Error! Main Document Only.**Abilify, or Aripiprazole, is used to treat the symptoms of schizophrenia. It is also used to treat episodes of mania or mixed episodes in persons with bipolar disorder or depression when symptoms cannot be controlled by the antidepressant alone. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Dec. 17, 2014).

[3] **Error! Main Document Only.**Cymbalta, or Duloxetine, is used to treat depression and generalized anxiety disorder; pain and tingling caused by diabetic neuropathy and fibromyalgia. www.nlm.nih.gov/medlineplus/druginfo/meds (last visited on Oct. 27, 2009).

indicated that plaintiff was polite throughout the interview, although somewhat reserved with a somewhat depressed mood. Helle diagnosed plaintiff with recurrent, moderate major depressive disorder and assigned plaintiff a Global Assessment of Functioning (GAF) score of 65.[4]

During her first appointment with Dr. Sabapathypillai, the psychiatrist noted that plaintiff's mother, who had Alzheimer's, and her brother lived with plaintiff. (Tr. 581–86). Plaintiff had three adult children and currently worked as a CMT at a group home in Cape Girardeau. Plaintiff's depression had worsened recently and she lost a job at a nursing home because of mistakes she made. Plaintiff stated that she took her medication every day, but had been overwhelmed and anxious about recent stressors. She made less money at her new job, and this increased her fear and anxiety regarding her financial situation. She also stated she had lost weight recently due to a loss of appetite, feeling overwhelmed, and a depressed mood. At times, plaintiff preferred to stay in bed because of a loss of interest in things she previously enjoyed, a lack of concentration and focus, and increasing guilt about her job situation. She denied suicidal thoughts even though she felt hopeless at times. Plaintiff also had excessive worry about her mother, whose memory was declining. Plaintiff was the primary caretaker for her mother.

Plaintiff stated that she had been depressed since the age of 21. She was prescribed medications for her mental health, but quit the medications when she felt better. Plaintiff stated that she had been hospitalized for bipolar disorder four years ago, although she did not think she experienced manic or hypomanic

---

[4] **Error! Main Document Only.** A GAF of 61–70 corresponds with "Some mild symptoms . . . OR some difficulty in . . . social, occupational, or school functioning, . . . but generally functioning pretty well, has some meaningful interpersonal relationships." American Psychiatric Association, <u>Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision</u> 34 (4th ed. 2000).

episodes. Plaintiff denied any attempts of suicide. She had had one counseling session when she was married, but currently was not receiving any other psychiatric services. All three of plaintiff's prior marriages involved emotional or physical abuse. Plaintiff had served in the Air Force from 1976 to 1981 and had a positive military experience. She drank alcohol occasionally and smoked one pack of cigarettes per day. Dr. Sabapathypillai diagnosed plaintiff with recurrent major depressive disorder without psychotic features, fibromyalgia, and irritable bowel syndrome (IBS). The doctor assigned plaintiff a GAF score of 60,[5] added Abilify as a mood adjunctive treatment for plaintiff's depression, increased Cymbalta, discontinued Xanax, and started plaintiff on Klonopin[6] as needed for anxiety. The doctor discussed relaxation coping skills and journaling with plaintiff and recommended blood work follow-up.

On December 9, 2009 (Tr. 581), Renee Taylor, M.S.W., L.C.S.W., attempted to call plaintiff for a depression screen follow-up, but received no answer. The social worker planned to continue to monitor plaintiff and attempt to engage her in psychotherapy. The next day plaintiff was seen by Dr. Sabapathypillai for a follow-up visit. (Tr. 578–81). According to plaintiff, she was working at a new job that she enjoyed more and found more relaxing. However, plaintiff stated that she had been feeling very restless since her last visit. When questioned about her medication, the doctor noted that plaintiff had not been taking Abilify as prescribed. She had passed out two times after taking a larger dose than prescribed. Because

---

[5] **Error! Main Document Only.**A GAF of 51–60 corresponds with "moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) OR difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers)." American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).

[6] **Error! Main Document Only.**Clonazepam, or Klonopin, is a benzodiazepine prescribed for treatment of seizure disorders and panic disorders. See Phys. Desk Ref. 2782 (60th ed. 2006).

plaintiff had not followed the directions on the bottle, she would run out of her medication soon. Plaintiff felt that Klonopin was not helping her with her anxiety at nighttime. She continued to have psychosocial stressors from her mother's condition, her job, and finances. Mental status examination notes indicate that plaintiff was calm and cooperative at the appointment, had good eye contact and normal speech, was rocking her legs and turning around while talking, and denied suicidal ideation. Dr. Sabapathypillai discussed with plaintiff the relationship between the higher dose of Abilify and plaintiff's agitation and restlessness. She instructed plaintiff to take half the dose of Abilify that she had been taking, increased plaintiff's prescription for Klonopin, and scheduled a follow-up appointment in three months.

Social worker Taylor contacted plaintiff by phone on January 8, 2010. (Tr. 578). Plaintiff reported that she was having no significant problems and felt more emotionally stable since seeing Dr. Sabapathypillai. Plaintiff had some anxiety because she thought she would run out of medications before seeing the doctor again. The social worker told plaintiff she would walk her through the process of ordering medication refills by phone. At plaintiff's next appointment with Dr. Sabapathypillai on March 18, 2010 (Tr. 575–77), plaintiff stated that she was feeling better since her medication adjustment. She had some anxiety over placing her mother in a nursing home when her mother's condition had worsened. Plaintiff had support from her brother at this time. Per a mental status examination, plaintiff was calm and cooperative, had good eye contact, a fine mood, and blunted affect. Dr. Sabapathypillai maintained her original diagnosis and GAF score for plaintiff's condition. Brief supportive therapy was given to plaintiff regarding the

placement and care of her elderly mother. The doctor continued plaintiff's medications and instructed her to follow up in six months or sooner as needed.

On August 17, 2010, plaintiff received medical care from Susan Joyce Smith, R.N.P. at the VA Outpatient Clinic for episodes of syncope and collapse. (Tr. 529, 566–74). Plaintiff reported profound feelings of fatigue over the past few months. She also had lost more than 30 pounds unintentionally and had significant hair loss. Plaintiff was 5'5'' and weighed 118 pounds. Plaintiff had smoked cigarettes for 35 years and expressed interest in smoking cessation. Nurse practitioner Smith noted that plaintiff appeared very tired and fatigued and had dry hair that came out easily with touch. Plaintiff stated that she was concerned she had leukemia since a family member had been diagnosed with leukemia. Laboratory studies and a chest x-ray were ordered. The only abnormalities noted in the lab results were elevated total cholesterol and low density lipoprotein cholesterol. (Tr. 568). The chest x-ray revealed moderate bilateral hyperaeration with no appreciable active infiltrate, effusion, or other acute intrathoracic process. (Tr. 532).

At a medication management and brief psychotherapy appointment with Dr. Sabapathypillai on September 24, 2010 (Tr. 562–64), plaintiff was very shaky and anxious. She complained of IBS and frequent stools. She stated that she had run out of Clonazepam weeks ago because of an expired prescription. Since then her anxiety and bowel movements had worsened. Plaintiff had requested her primary care doctor to prescribe something for diarrhea, since over-the-counter medication did not help. The doctor's mental status examination notes indicate that plaintiff was in apparent distress, had an obvious tremor, avoided eye contact, was in a depressed and anxious mood, and denied suicidal ideation. Dr. Sabapathypillai

diagnosed plaintiff with recurrent major depressive disorder and anxiety. She assigned plaintiff a GAF score of 50.[7]  Because plaintiff felt Clonazepam was not strong enough, the doctor changed her prescription back to Xanax.  Plaintiff was prescribed Bentyl[8] for her increase in IBS symptoms.  Dr. Sabapathypillai maintained plaintiff's other medications and instructed her to follow up in two months.

Plaintiff saw nurse practitioner Smith on October 18, 2010 for incontinence of stool on a daily basis.  (Tr. 554–55).  Plaintiff reported that she was fired from her job because of sudden incontinence of stool.  She did not experience any relief from Bentyl.  Plaintiff was very tearful and anxious about her condition and the future.  Plaintiff stated that Lomotil[9] had been effective for her in the past and requested a gastrointestinal consultation.  Smith noted that plaintiff was crying and appeared very distressed and fatigued.  Plaintiff stated that she had chronic panic attacks and requested an emergency visit with Dr. Sabapathypillai to discuss her mental health issues.  Smith placed a request for Lomotil for plaintiff and scheduled an appointment for her with Dr. Sabapathypillai.  (Tr. 542–44, 555–57).

In a Physical Medical Source Statement nurse practitioner Smith completed for plaintiff on December 18, 2010 (Tr. 706–07), she opined that plaintiff could lift or carry five pounds occasionally and less than five pounds frequently.  Plaintiff could not stand or walk continuously or throughout an eight-hour day with usual breaks due to gastrointestinal problems.  The nurse practitioner wrote that plaintiff

---

[7] **Error! Main Document Only.**A GAF of 41–50 corresponds with "serious symptoms OR any serious impairment in social, occupational, or school functioning."  American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders - Fourth Edition, Text Revision 34 (4th ed. 2000).
[8] Bentyl, or Dicyclomine, is an anticholinergic used to treat the symptoms of irritable bowel syndrome. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a684007.html (last visited November 17, 2015).
[9] Lomotil, or Diphenoxylate, is an antidiarrheal agent that decreases bowel activity. https://www.nlm.nih.gov/medlineplus/druginfo/meds/a601045.html (last visited November 17, 2015).

could sit continuously at one time for less than fifteen minutes and sit throughout an eight-hour workday for less than one hour because of her bathroom needs. Plaintiff could engage in limited pushing and pulling. With respect to postural and manipulative factors, Smith opined that plaintiff could occasionally climb, balance, stoop, kneel, crouch and crawl. Plaintiff could frequently reach, handle, finger, feel, see, speak and hear. Plaintiff did not require the use of any assistive devices for ambulation or balance. As to environmental factors, plaintiff should avoid any exposure to extreme heat, extreme cold, weather, wetness or humidity, dust or fumes, vibration, hazards and heights. Smith noted that plaintiff's gastrointestinal medications may act to sedate her.

Diane Copeland, a social worker at the VA Outpatient Clinic, spoke with plaintiff on October 19, 2010. (Tr. 553). Plaintiff did not need a referral to a food bank. Her brother made the mortgage payment on the house. Plaintiff's car was paid for and she was able to purchase gas as needed. Plaintiff's only expressed need for assistance was for help paying her power bill. Plaintiff was given contact information for the Salvation Army. Plaintiff met with Donald J. Scandell, Ph.D., a clinical psychologist at the Veterans Clinic, for an initial mental health assessment on November 16, 2010. (Tr. 699–703). Dr. Scandell diagnosed plaintiff with major depression, work stress, and a GAF score of 50. The doctor advised plaintiff to attend a recovery group with social worker Helle to decrease her anxiety and depression.

At an appointment with Dr. Sabapathypillai on December 3, 2010 (Tr. 696–98), plaintiff was well-dressed and in a better mood. Plaintiff had recently started working as a CMT at a nursing home passing out medication. The job helped

plaintiff financially, but she felt stressed about learning new job skills. Plaintiff weighed 104 pounds, was casually dressed, engaged, and very quiet. Dr. Sabapathypillai diagnosed plaintiff with a mood disorder not otherwise specified, panic disorder without agoraphobia, and a GAF score of 55. The doctor instructed plaintiff to continue using Cymbalta, Abilify and Xanax, continue therapy, and follow up in three weeks.

In a Psychiatric Review Technique dated December 21, 2010 (Tr. 596–606), Gretchen Brandhorst, Psy.D., found that plaintiff's medically determinable impairments included recurrent major depressive disorder and anxiety. In rating plaintiff's functional limitations, Dr. Brandhorst found that plaintiff had no restriction in her activities of daily living, mild difficulties maintaining social functioning, mild difficulties maintaining concentration, persistence or pace, and no repeated episodes of decompensation. In her notes, Dr. Brandhorst considered plaintiff's allegations partially credible based on the total evidence in the record. With use of medications, Dr. Brandhorst concluded that plaintiff's impairments were not severe.

At a routine evaluation with Steven Spence Smith, D.O., on March 8, 2011, plaintiff asked if she could be given a note saying she was unable to lift. (Tr. 690–95). However, Dr. Smith found that plaintiff did not have any objective evidence of skeletal or muscular conditions that would preclude her from doing some light lifting at her nursing home job. Plaintiff continued to smoke against advice. Dr. Smith gave plaintiff a note stating she had no restrictions for work and no active physical problems. She was strongly advised to discontinue smoking, but she did not agree to participate in any smoking clinics or utilize nicotine replacement.

On March 18, 2011 (Tr. 686–89), plaintiff walked into an appointment with Dr. Sabapathypillai very depressed and down and avoided eye contact. She burst into tears stating that her 24-year old son had committed suicide one week earlier. The doctor allowed plaintiff to be emotional and cry, supporting her through her grief. Plaintiff expressed guilt over her son's suicide and worried she would be unable to return to work that evening. The doctor agreed to provide plaintiff a letter for work asking for one week off to receive therapy, counseling, and medication. Plaintiff had support from a boyfriend and two daughters with whom she was close. Dr. Sabapathypillai diagnosed plaintiff with grief, depressive disorder, panic disorder without agoraphobia, and a GAF score of 45. Plaintiff agreed to see a therapist for grief and ventilation on Monday and Dr. Sabapathypillai in one week for reevaluation. Plaintiff was given a crisis line number to call in case of emergency.

Plaintiff saw social worker Helle for grief counseling on March 21, 2011. (Tr. 685–86). Her goals included coping with grief and the loss of a child. No suicidal or homicidal ideation was verbalized. Plaintiff was encouraged to let go of her guilt over her son's death. She was supported by her friends, family, and faith that her son was in a better place. Plaintiff appeared more at peace as the session concluded. Plaintiff met with social worker Diane Bracamontes for supportive counseling at the request of Dr. Sabapathypillai on March 22, 2011. (Tr. 684). Plaintiff requested another letter to give to her employer to prevent disciplinary action, which Dr. Sabapathypillai provided. Plaintiff did not want to talk for long and appeared somewhat relieved after the session concluded. Bracamontes wrote that plaintiff was going to spend the day with her boyfriend.

Plaintiff was very quiet at her next appointment with Dr. Sabapathypillai on March 25, 2011. (Tr. 681–83). She stated that it was still difficult for her to continue with daily activities. Plaintiff reported more diarrhea, a lack of appetite, lost weight, and grief. Mental status examination notes indicate that plaintiff had psychomotor retardation, avoided eye contact, and had a depressed mood with anxious affect. Dr. Sabapathypillai diagnosed plaintiff with recurrent major depressive disorder, bereavement, and assigned a GAF score of 50. Plaintiff was instructed to continue her medications as prescribed and follow up in one month. On April 29, 2011 (Tr. 678–81), Dr. Sabapathypillai noted that plaintiff was still dealing with grief over the loss of her son. Xanax had not helped plaintiff, and she had hives from anxiety attacks. Mental status exam notes indicate that plaintiff was anxious, had avoidant behavior, anxious mood, and appropriate affect. Dr. Sabapathypillai renewed Abilify and Cymbalta for plaintiff, discontinued Xanax, added Lorazepam[10] as needed for anxiety, and encouraged plaintiff to attend individual therapy.

On May 24, 2011, plaintiff went to the walk-in clinic and received medical attention from nurse practitioner Smith for a swollen upper lip and hives on her legs and arms. (Tr. 672–78). Plaintiff stated that her blood pressure had been running low since the death of her son and related stressors. Smith diagnosed plaintiff with neurotic angioedema and urticaria[11] and prescribed plaintiff a Medrol dosepak. If plaintiff did not improve in 24 hours, she was instructed to go to urgent care for evaluation. On July 1, 2011, plaintiff discussed the loss of her son and her

---

[10] **Error! Main Document Only.**Ativan is a brand name for Lorazepam and is prescribed to treat anxiety. http://www.nlm.nih.gov/medlineplus/druginfo/medmaster/a682053.html (last visited on Aug. 29, 2007).
[11] Swelling both under and on the surface of the skin.
https://www.nlm.nih.gov/medlineplus/ency/article/000846.htm (last visited November 17, 2015).

difficulties with the grieving process with Dr. Sabapathypillai. (Tr. 670–72). Many days she still blamed herself and held onto the tragedy. Plaintiff was in a supportive relationship and was trying cope. She had an accident that morning due to IBS. Dr. Sabapathypillai diagnosed plaintiff with bereavement and depressive disorder not otherwise specified and assigned plaintiff a GAF score of 50. The doctor discussed with plaintiff the importance of taking her medication as prescribed, as well as her dietary habits. Lorazepam helped her, but plaintiff had not been taking it as prescribed.

On July 14, 2011, a pharmacist reported to a nurse at the Veterans Clinic that plaintiff was very upset and crying on the phone. (Tr. 668–69). Plaintiff asked for an appointment with Dr. Sabapathypillai, but the doctor was not at the clinic that day. The nurse tried to convince plaintiff to see a different doctor, but plaintiff refused. Plaintiff indicated that she was having withdrawals from Cymbalta and stated she "may just go to the ER so they can give me my medication." She had run out of Cymbalta three weeks earlier, but did not have money to get medication outside the VA clinic. The pharmacy was able to overnight two days' supply of Cymbalta to plaintiff. Plaintiff denied suicidal ideations. Nonetheless, plaintiff presented to the emergency department at Southeast Missouri Hospital that day with complaints of overwhelming anxiety, depression, and vague suicidal thoughts. (Tr. 729, 782, 955). A psychiatric examination indicated that plaintiff had normal insight, flat affect, suicidal ideation without a plan, and tearfulness. (Tr. 735–45, 788–96, 916–70). Plaintiff was admitted to the psychiatric unit. Laboratory evaluation completed on admission was normal. Cymbalta was not restarted due to her complaints of it not working and difficulty getting off of it. Plaintiff was

diagnosed with a depressed episode of bipolar disorder. She was started on a trial of Effexor,[12] continued on Ativan and Abilify without change, and given Ambien for insomnia. Plaintiff tolerated the medications well and was able to discuss some of her recent stressors in supportive psychotherapy. By July 16 she was stabilized and ready for discharge. She was assigned GAF scores of 45 on admission and 60 on discharge.

Plaintiff's next appointment with Dr. Sabapathypillai was on August 19, 2011. (Tr. 660–64). Plaintiff stated that she had gone to the emergency room in July because of depression and not having enough Cymbalta in her system. Since then she had started a new job that was less stressful and allowed her to enjoy her life. Plaintiff continued having on and off grief and memories of her deceased son. Dr. Sabapathypillai diagnosed plaintiff with recently diagnosed bipolar disorder, bereavement and fibromyalgia. She assigned plaintiff a GAF score of 50. The doctor continued plaintiff on her discharge medications, including Effexor, Abilify and Ritalin. Plaintiff was advised to see a therapist to discuss her stressors and bereavement.

On November 18, 2011, plaintiff called a mental health hotline reporting symptoms of an anxiety attack and an inability to go to work. (Tr. 648–51). Plaintiff was tearful and stated that she was very depressed. At first she denied suicidal thoughts, but upon questioning admitted to passive suicidal ideation. Plaintiff agreed to go to a community-based outpatient clinic for medical clearance to be transferred to an inpatient psychiatric facility. Plaintiff was first assessed by social worker Helle for medical clearance. (Tr. 649–50). Helle noted that plaintiff

---

[12] **Error! Main Document Only.**Effexor, or Venlafaxine, is indicated for the treatment of major depressive disorder. See Phys. Desk Ref. 3196 (63rd ed. 2009).

appeared tearful and lethargic with restricted affect and depressed mood. She denied suicidal ideation, plan, means, or intent. Her boyfriend was present with her in the clinic. Plaintiff thereafter went to the Southeast Hospital emergency room by private vehicle. (Tr. 613–15).

Plaintiff presented to the emergency room with complaints of overwhelming depression, frustration, anxiety, and suicidal ideation. (Tr. 713–14, 764–65, 937–38). Upon psychiatric examination, plaintiff had normal affect, insight, concentration, and memory. (Tr. 721–27, 774–80, 947–53). Plaintiff stated that she felt very deflated, but denied suicidal thoughts or intent. Plaintiff was admitted to the psychiatric unit in stable condition. Laboratory evaluation was normal, aside from a urine drug screen positive for cannabis. Plaintiff was diagnosed with a current depressed episode of bipolar disorder. Her Effexor and Abilify prescriptions were increased while Lyrica and Ativan were maintained. She agreed to attend groups and receive individual psychotherapy as needed. (Tr. 717–18, 769–72, 924–46). Plaintiff did well with the changes in medication and was ready for discharge on November 21. Her GAF score was 45 on admission and 60 on discharge. Because plaintiff had not been admitted for suicidal ideation, she was not identified as a high risk for suicide. (Tr. 646).

Plaintiff saw Dr. Sabapathypillai for medication management and brief psychotherapy on December 16, 2011. (Tr. 642–45). She stated that she had had anxiety every day and was fearful of making a mistake and being discharged from her job. Plaintiff reported a lack of self-esteem and self-confidence. Because Ativan had not helped, plaintiff wanted to discontinue it and restart Xanax. She had complaints of trouble sleeping at times. Plaintiff was described as having a

very retarded psychomotor and anxiety in mental status exam notes. She denied suicidal ideation. Dr. Sabapathypillai diagnosed plaintiff with bipolar disorder, depression, and anxiety disorder, assigned plaintiff a GAF score of 55, and prescribed plaintiff Abilify, Venlafaxine, and Xanax.

At a three-month follow-up appointment with Dr. Sabapathypillai on March 16, 2012, plaintiff was very anxious, emotional, and tearful. (Tr. 639–42). Plaintiff stated that the first anniversary of her son's death was very hard for her. In the past three weeks, she had lost her job because she made a medication error at the nursing home. She had started working through another agency, attending to elderly people. Plaintiff had a large tattoo of her son's face on her arm, which she stated helped her cope. Plaintiff was able to smile a little in between conversation with the doctor, but continued to be physically ill, depressed, sad, without motivation, drive, and with poor concentration. Dr. Sabapathypillai continued plaintiff's medications and suggested a follow-up appointment in three months. Lab test results in March 2012 showed that plaintiff had low vitamin D and slightly elevated triglycerides. (Tr. 633). A nurse educated her on diet and exercise.

Plaintiff's mental health treatment notes next resume on June 8, 2012. (Tr. 839, 896). At an appointment with Dr. Sabapathypillai, plaintiff was very emotional and tearful and avoided eye contact. She showed the doctor an entry in her journal that indicated she was at the end of her rope, hopeless, and wanted to die. Plaintiff told the doctor that her boyfriend was the only person who supported her, but that he had been sent to jail. She felt overwhelmed by financial obligations. Plaintiff had lost weight, was not sleeping, and was depressed and suicidal. Dr. Sabapathypillai assigned plaintiff a GAF score of 40 and suggested plaintiff be

hospitalized for inpatient treatment due to her current instability and safety concerns.  Plaintiff agreed.  Ronald Leckie, D.O. conducted a medical clearance examination of plaintiff at Southeast Missouri Hospital.  (Tr. 748–61, 921–34). Plaintiff was oriented, had normal insight, concentration, judgment, memory, flat affect, and suicidal ideation without a plan.  She tested positive for benzodiazepines and cannabis.  Plaintiff was voluntarily admitted for inpatient mental health treatment at Jefferson Barracks.

The next day, plaintiff told Francis X. Jana, M.D. that she was not suicidal but did not want to go home.  (Tr. 815–25, 872–82).  She wanted to talk to a social worker about her financial situation.  Dr. Jana opined that plaintiff was a low suicide risk.  Per a mental status examination, plaintiff was slow, had a soft tone to her voice, normal thought process, normal concentration, normal orientation, and good insight to her psychiatric condition.  Plaintiff stated that she was still depressed from the loss of her son and financial strain weighed heavily on her.  Dr. Jana assigned plaintiff a GAF score of 42 and diagnosed plaintiff with bipolar disorder, anxiety or depression, and persistent bereavement.  Plaintiff spent the day lying quietly in bed, stating, "I'm just tired."  (Tr. 814, 871).  In the morning she received Alprazolam[13] for anxiety, which was reported as effective.  Plaintiff did not require any psychotropic medications that evening.  On June 10 plaintiff remained in bed most of the day due to boredom, per her reports.  (Tr. 812, 869).  She wanted to go home, but understood the rules.  On June 11 plaintiff was discharged in stable condition without home care services.  (Tr. 807–11).  She reported feeling

---

[13] **Error! Main Document Only.**Alprazolam belongs to the class of medications known as benzodiazepines and is used to treat anxiety and panic disorders. http://www.nlm.nih.gov/medlineplus/
druginfo/meds/a684001.html (last visited on June 28, 2011).

less depressed and agreed to medication compliance. (Tr. 811, 868). A high risk for suicide identification flag was placed in her medical chart. (Tr. 862–66). The lethality of this event was labeled as "low" by her suicide prevention case manager. (Tr. 803–06, 860–61). Plaintiff was scheduled for individual therapy and medication management and would be monitored weekly.

The suicide prevention case manager spoke with plaintiff by phone on June 15, 2012 regarding her recent discharge from Jefferson Barracks. (Tr. 802, 859). Plaintiff related that she was doing better. Plaintiff was unable to speak for long since she was at work. She was informed that she had been identified as a high risk for suicide, but plaintiff denied suicidal ideation. On June 22, 2012, plaintiff told Dr. Sabapathypillai that she was doing better since her discharge. (Tr. 799–801, 856–58). Her medication regime had not changed, but plaintiff stated that she was able to accept and deal with things. Her boyfriend remained in jail and plaintiff was facing financial difficulties. Her electricity had been shut off, but her brother was trying to get the service restored. Plaintiff was working currently and her concentration was better. Mental status exam notes indicate that plaintiff was in a calm mood, was relaxed and engaged during the interview, had an anxious affect, and denied suicidal ideation. The doctor assigned plaintiff a GAF score of 50. Supportive therapy, problem solving and recent stressors were discussed. Plaintiff would continue Venlafaxine, Xanax, and Abilify as prescribed and follow up in one month.

On July 9, 2012, Dr. Sabapathypillai completed a Mental Medical Source Statement for plaintiff. (Tr. 913–17). Dr. Sabapathypillai opined that plaintiff was markedly limited in her ability to remember locations and work-like procedures, in

addition to understanding and remembering very short and simple instructions. Plaintiff was extremely limited in her ability to understand and remember detailed instructions. With respect to plaintiff's sustained concentration and persistence, Dr. Sabapathypillai noted that plaintiff was markedly limited in her ability to carry out very short and simple instructions, maintain attention and concentration for extended periods, sustain an ordinary routine without special supervision, and make simple work related decisions. Plaintiff was extremely limited in her ability to carry out detailed instructions, perform activities within a schedule, maintain regular attendance, be punctual within customary tolerances, and work in coordination with or proximity to others without being distracted by them. She was further extremely limited in her ability to complete a normal workday and workweek without interruption from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods. With respect to plaintiff's social interaction abilities, Dr. Sabapathypillai wrote that plaintiff was extremely limited in her ability to interact appropriately with the general public, ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, and maintain socially appropriate behavior and adhere to basic standards of neatness and cleanliness. Plaintiff was markedly limited in her ability to accept instructions and respond appropriately to criticism from supervisors. As to plaintiff's ability to adapt, Dr. Sabapathypillai noted that plaintiff was markedly limited in her ability to respond appropriately to changes in the work setting, as well as be aware of normal hazards and take appropriate precautions. Plaintiff was extremely limited in her ability to travel in unfamiliar places or use public transportation and set realistic

goals or make plans independently of others.  At the bottom of the form, the doctor wrote that plaintiff had an extreme emotional, mental condition that prevents her from holding gainful employment.

The suicide prevent case manager contacted plaintiff again on July 20, 2012. (Tr. 1033–34).  Plaintiff related that she was doing all right and denied suicidal ideation.  She was scheduled to work that afternoon.  At her appointment with Dr. Sabapathypillai on August 3, 2012 (Tr. 1030–33), plaintiff was upset about the denial of her social security claim and planned to appeal.  She described dizzy spells, lightheadedness, being sick to her stomach, depression, crying episodes, memories, and flashbacks.  Mental status exam notes indicate that plaintiff was very anxious, unhappy about a recent incident, had a depressed mood, appropriate affect, and denied suicidal ideation.  The doctor continued plaintiff on her current medication.  On August 13, 2012, plaintiff reported to Kirit Sutaria, M.D., at the Veterans Clinic that she felt dizzy and as if she was going to pass out when she stood up from kneeling or stooping.  (Tr. 1024–30).  Her blood pressure was around 80 to 90 over 50.  Plaintiff stated she was fasting today.  Dr. Sutaria advised plaintiff to eat a salty diet and drink plenty of fluids.

At a follow up visit for low blood pressure on August 28, 2012 (Tr. 1017–24), plaintiff reported fainting spells.  Her blood pressure in the clinic that day was 79 over 55.  Plaintiff was diagnosed with syncope and hypotension.  Laboratory testing was ordered and the nurse practitioner discussed with plaintiff the possibility that her medications might be triggering hypotension.  Plaintiff also was told she would need to see a gastroenterologist before she would be given Lomotil.  On August 30, 2012, plaintiff told her suicide prevention case manager that she was stressed

because her electricity was going to be shut off soon because the electric company would not work with her on her bill. (Tr. 1017). Plaintiff denied suicidal ideation even though she faced these stressors. She was offered additional mental health services, but declined the offer. Plaintiff only wished to see Dr. Sabapathypillai. Because plaintiff faced multiple overwhelming psychosocial stressors, the suicide prevention consultation team continued plaintiff's suicide patient record flag on September 13, 2012. (Tr. 1015). Plaintiff remained flagged due to the recommendation of her medication provider on October 19, 2012. (Tr. 1012).

After consultation with gastroenterologist Timothy J. Edwards, M.D. for abdominal pain and diarrhea (Tr. 976–78), plaintiff had a colonoscopy on November 26, 2012. (Tr. 972–75). The colonoscopy showed normal mucosa throughout the colon. Dr. Edwards advised another colonoscopy in ten years and continued plaintiff on her prescribed medications. The suicide prevention consultation team determined that plaintiff was no longer considered to be at a high risk for suicide on December 7, 2012. (Tr. 1006). Plaintiff had not contacted crisis services and had denied any suicidal thoughts or plans at her most recent mental health visit.

On December 10, 2012 (Tr. 997–1005), plaintiff told nurse practitioner Smith that she was concerned about her low blood pressure and constant fatigue. Smith noted that plaintiff's recent surveillance colonoscopy was found to be within normal limits. Plaintiff requested a follow up with Dr. Edwards and to restart Lomotil to control her diarrhea. At her next appointment with Dr. Sabapathypillai on December 14, 2012 (Tr. 994–97), plaintiff stated that she recently had been sleeping anywhere from 12 to 14 hours a day. She worked part-time, but was not motivated and had no energy. She denied any major anxiety. Plaintiff was able to

keep food down and had gained some weight, but requested something to increase her energy. The doctor discussed various craft ideas and activities with plaintiff to keep her busy during the winter time. Mental status exam notes indicate that plaintiff was dressed well with make-up, had good eye contact, was much calmer, had a fine mood, appropriate affect, and reported no pain at the visit. Dr. Sabapathypillai assigned plaintiff a GAF score of 55 and gave her a trial of Ritalin to increase her energy and attention. Plaintiff would continue Venlafaxine, Xanax and Lyrica as prescribed. Plaintiff claimed to be a non-user of tobacco products. On January 2, 2013, Dr. Sabapathypillai agreed to increase plaintiff's dosage of Ritalin per her request, but warned her to monitor her anxiety. (Tr. 993).

At a psychiatry appointment with Dr. Sabapathypillai on March 15, 2013 (Tr. 1092–96), plaintiff stated that the long number of hours she slept each night caused trouble in her relationship. Plaintiff was working 8 to 12 hours three times a week as an in-home caretaker. Plaintiff was worried about an impending foreclosure on her home. Plaintiff discussed the recent second anniversary of the death of her son. Plaintiff's current medications included Tramadol, Xanax, Atropine, Lyrica, Venlafaxine, and Abilify. Plaintiff only took Tramadol once a week. Dr. Sabapathypillai discussed with plaintiff the effects of medication on sleep and offered her a sleep study, which she declined. The doctor diagnosed plaintiff with major depressive disorder, anxiety, fibromyalgia and a GAF score of 55. Plaintiff was asked to cut back on some of her medications due to the effects of sedation. Plaintiff declined to engage in behavior therapy, and was asked alternatively to consider walking or community groups. Her follow up appointment was scheduled in three months.

Plaintiff saw nurse practitioner Smith in the primary care clinic on April 18, 2013 for continued feelings of fatigue and lethargy. (Tr. 1086–92). On June 27, 2013, plaintiff told Smith that she felt as if she were about to faint. (Tr. 1079–85). She was noted to have had chronic hypotension for a number of years. Her current blood pressure was 83 over 57. Plaintiff was given a prescription for Midodrine[14] and told to let the clinic know if the medication was effective. On July 9, 2013, plaintiff reported that she felt less dizzy since starting Midodrine, but did not experience increased energy. Plaintiff was advised she could increase her dosage of Midodrine to see if that helped.

At a medication management appointment with Dr. Sabapathypillai on August 2, 2013, plaintiff shared her journal with the doctor. (Tr. 1069–72). Most of her notes indicated that she slept about 16 hours a day. She had thoughts about her son, financial troubles, and relationship issues stemming from financial problems. Because plaintiff only worked part-time, she was unable to pay all of her bills. Plaintiff stated that she had no interest or energy. Plaintiff rejected the idea that Xanax could be contributing to some of her symptoms and felt she needed more Xanax to calm her nerves. Plaintiff felt fatigued, tired, and concerned about her low blood pressure. She declined individual therapy. Dr. Sabapathypillai advised plaintiff to take Venlafaxine in the evening due to sedation and continue Abilify and Xanax only as needed. Plaintiff was instructed to follow up in two months.

On October 2, 2013, plaintiff was dressed well at her appointment with Dr. Sabapathypillai in preparation for a job interview that day. (Tr. 1065–68). Plaintiff

---

[14] Midodrine helps maintain blood pressure by causing arteries to constrict. http://www.merckmanuals.com/home/brain-spinal-cord-and-nerve-disorders/autonomic-nervous-system-disorders/overview-of-the-autonomic-nervous-system (last visited November 17, 2015).

stated that she had been evicted from her home and had moved in with her daughter. Plaintiff had also started a new relationship and gained some weight. She reported continued anxiety over some factors in her life. She also reported medication compliance. Mental status exam notes indicate that plaintiff was engaged, calm, cooperative, anxious, and denied suicidal ideation. Dr. Sabapathypillai assigned plaintiff a GAF score of 56 and continued her medications. At a follow-up appointment with Dr. Sabapathypillai on November 15, 2013 (Tr. 1054–57), plaintiff described a recent panic attack at her workplace. She started shaking, had chest tightness, and felt like she was going to die. The attack lasted approximately ten minutes. After the incident, plaintiff was drained of energy. Plaintiff was fearful of having more of these episodes, which prevented her from driving. Plaintiff was very concerned and felt guilty for not helping her children and depending on them instead. She admitted to using tobacco products. The doctor suggested therapy for relaxation and to prevent panic attacks, which plaintiff stated she would consider.

On February 14, 2014 (Tr. 77), plaintiff complained of a headache due to starting Prozac and discontinuing Effexor. Plaintiff was instructed to stop Prozac and resume Effexor. In a letter from Dr. Sabapathypillai dated March 5, 2014 (Tr. 1105), the doctor wrote that plaintiff declined therapy because of limited time and transportation issues. Plaintiff had had several suicidal ideations and her mental health condition started worsening after her son's suicide. Despite plaintiff's issues, she attempted to maintain either full- or part-time work. Dr. Sabapathypillai opined that plaintiff would not be able to hold gainful employment due to her mental condition and the medication she took. The doctor recommended that

plaintiff continue to receive therapy and medication management on an ongoing basis to manage her psychiatric condition. Subsequent treatment notes indicate that plaintiff did not have any risk of suicide. (Tr. 63–65, 69–77). The remaining medical records presented to the Appeals Council pertain to plaintiff's smoking cessation efforts, lab testing, and other routine appointments.

### III. The ALJ's Decision

In the decision dated February 4, 2014, the ALJ made the following findings:

1. Plaintiff meets the insured status requirements of the Social Security Act through December 31, 2017.

2. Plaintiff has not engaged in substantial gainful activity since November 1, 2011, the amended alleged onset date of disability.

3. Plaintiff has the following severe impairments: fibromyalgia (FMS), irritable bowel syndrome (IBS), major depression, anxiety disorder and bipolar disorder.

4. Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

5. Plaintiff has the residual functional capacity to perform medium work as defined in 20 C.F.R 404.1567(c) and 416.967(c), except that plaintiff can sit for six of eight hours per day; stand and walk for six of eight hours per day; lift 50 pounds occasionally and 25 pounds frequently; is limited to simple, repetitive work tasks and can have only superficial contact with the public and coworkers. Plaintiff would be best suited to working with things rather than people.

6. Plaintiff is unable to perform any past relevant work.

7. Plaintiff was born on March 28, 19567 and was 54 years old, which is defined as an individual closely approaching advanced age, on the amended alleged disability onset date. Plaintiff subsequently changed age category to advanced age.

8. Plaintiff has at least a high school education and is able to communicate in English.

9. Transferability of job skills is not material to the determination of disability, because using the Medical-Vocational Rules as a framework

supports a finding that plaintiff is "not disabled," whether or not plaintiff has transferable job skills.

10.   Considering plaintiff's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that plaintiff can perform.

11.   Plaintiff has not been under a disability, as defined in the Social Security Act, from November 1, 2011, through the date of the ALJ's decision.

(Tr. 89–106).

## IV.   Legal Standards

The Court must affirm the Commissioner's decision "if the decision is not based on legal error and if there is substantial evidence in the record as a whole to support the conclusion that the claimant was not disabled."  Long v. Chater, 108 F.3d 185, 187 (8th Cir. 1997).  "Substantial evidence is less than a preponderance, but enough so that a reasonable mind might find it adequate to support the conclusion."  Estes v. Barnhart, 275 F.3d 722, 724 (8th Cir. 2002) (quoting Johnson v. Apfel, 240 F.3d 1145, 1147 (8th Cir. 2001)).  If, after reviewing the record, the Court finds it possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Court must affirm the decision of the Commissioner.  Buckner v. Astrue, 646 F.3d 549, 556 (8th Cir. 2011) (quotations and citation omitted).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least twelve continuous months.  42 U.S.C. § 423(a)(1)(D), (d)(1)(A); Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).  The Commissioner has established a five-step process for determining whether a person

is disabled.  See 20 C.F.R. § 404.1520; Moore v. Astrue, 572 F.3d 520, 523 (8th Cir. 2009).  "Each step in the disability determination entails a separate analysis and legal standard."  Lacroix v. Barnhart, 465 F.3d 881, 888 n.3 (8th Cir. 2006).

Steps one through three require the claimant to prove (1) she is not currently engaged in substantial gainful activity, (2) she suffers from a severe impairment, and (3) her disability meets or equals a listed impairment.  Pate-Fires, 564 F.3d at 942.  If the claimant does not suffer from a listed impairment or its equivalent, the Commissioner's analysis proceeds to steps four and five.  Id.

"Prior to step four, the ALJ must assess the claimant's residual functioning capacity ('RFC'), which is the most a claimant can do despite her limitations." Moore, 572 F.3d at 523 (citing 20 C.F.R. § 404.1545(a)(1)).  "RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."  Social Security Ruling (SSR) 96-8p, 1996 WL 374184, *2. "[A] claimant's RFC [is] based on all relevant evidence, including the medical records, observations by treating physicians and others, and an individual's own description of his limitations."  Moore, 572 F.3d at 523 (quotation and citation omitted).

In determining a claimant's RFC, the ALJ must evaluate the claimant's credibility.  Wagner v. Astrue, 499 F.3d 842, 851 (8th Cir. 2007); Pearsall v. Massanari, 274 F.3d 1211, 1217 (8th Cir. 2002).  This evaluation requires that the ALJ consider "(1) the claimant's daily activities; (2) the duration, intensity, and frequency of the pain; (3) the precipitating and aggravating factors; (4) the

dosage, effectiveness, and side effects of medication; (5) any functional restrictions; (6) the claimant's work history; and (7) the absence of objective medical evidence to support the claimant's complaints." Buckner, 646 F.3d at 558 (quotation and citation omitted). "Although 'an ALJ may not discount a claimant's allegations of disabling pain solely because the objective medical evidence does not fully support them,' the ALJ may find that these allegations are not credible 'if there are inconsistencies in the evidence as a whole.'" Id. (quoting Goff v. Barnhart, 421 F.3d 785, 792 (8th Cir. 2005)). After considering the seven factors, the ALJ must make express credibility determinations and set forth the inconsistencies in the record which caused the ALJ to reject the claimant's complaints. Singh v. Apfel, 222 F.3d 448, 452 (8th Cir. 2000); Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

At step four, the ALJ determines whether a claimant can return to her past relevant work, "review[ing] [the claimant's] [RFC] and the physical and mental demands of the work [claimant has] done in the past." 20 C.F.R. § 404.1520(e). The burden at step four remains with the claimant to prove her RFC and establish that she cannot return to her past relevant work. Moore, 572 F.3d at 523; accord Dukes v. Barnhart, 436 F.3d 923, 928 (8th Cir. 2006); Vandenboom v. Barnhart, 421 F.3d 745, 750 (8th Cir. 2005).

If the ALJ holds at step four of the process that a claimant cannot return to past relevant work, the burden shifts at step five to the Commissioner to establish that the claimant maintains the RFC to perform a significant number of jobs within the national economy. Banks v. Massanari, 258 F.3d 820, 824 (8th Cir. 2001). See also 20 C.F.R. § 404.1520(f).

If the claimant is prevented by her impairment from doing any other work, the ALJ will find the claimant to be disabled.

## V. Discussion

In arguing for reversal or remand, plaintiff contends that the ALJ failed to give good reasons for giving little weight to the opinion of treating psychiatrist Dr. Sabapathypillai. Additionally, plaintiff asserts that the ALJ's RFC determination is not supported by substantial evidence in the record.

### A. Dr. Sabapathypillai's Opinion

Dr. Sabapathypillai completed a Mental Medical Source Statement for plaintiff on July 9, 2012. (Tr. 913–17). The doctor opined that plaintiff was markedly or extremely limited in every category of functioning. The ALJ gave little weight to Dr. Sabapathypillai's opinion, finding that the extreme limitations recorded in her opinion were not consistent with the medical evidence in the record, including the doctor's own treatment notes. (Tr. 99). The ALJ also stated that because plaintiff testified that Dr. Sabapathypillai did not know she was working part-time on a sustained basis, the doctor did not have all of the information needed for a full assessment. Id.

A treating source's opinion is not "inherently entitled" to controlling weight. Hacker v. Barnhart, 459 F.3d 934, 937 (8th Cir. 2006) (citing 20 C.F.R. § 404.1527(d)(2)). "Generally, '[a] treating physician's opinion is due controlling weight if that opinion is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.'" Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (quoting Hogan v. Apfel, 239 F.3d 958, 961 (8th Cir. 2001)). However, "[a]n ALJ

may 'discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions.'"  Goff, 421 F.3d at 790 (quoting Prosch v. Apfel, 201 F.3d 1010, 1013 (8th Cir. 2000)); see also Myers v. Colvin, 721 F.3d 521, 525 (8th Cir. 2013) ("Because the regulations only accord [controlling] weight to source opinions if they are not inconsistent with the other substantial evidence, we have upheld an ALJ's decision to discount a treating physician's opinions where those opinions were internally inconsistent and where the physician's opinion was inconsistent with the claimant's own testimony.") (internal quotations and citations omitted).

Plaintiff contends that the ALJ failed to identify the inconsistencies between Dr. Sabapathypillai's opinion and the medical evidence in the record.  However, the ALJ noted plaintiff's brief hospitalizations for depression and suicidal ideation after the alleged onset date in the record.  In each hospitalization, plaintiff's medications were adjusted and she was treated with therapy.  On each occasion, plaintiff was discharged in stable condition after three days and was referred to outpatient services.  (Tr. 764, 856).  Plaintiff's assigned GAF scores improved 15 points between admission and discharge with respect to the November 2011 inpatient treatment.  (Tr. 764).  Her three-day hospitalization in July 2011 was substantially similar.  (Tr. 782).  The ALJ found that plaintiff's marked increase in functioning indicated that, when complied with, plaintiff's mood fluctuations were responsive to medications and therapy.  (Tr. 98); see Hutton v. Apfel, 175 F.3d 651, 655 (8th

Cir. 1999) ("Impairments that are controllable or amendable to treatment do not support a finding of total disability.").

Additionally, the ALJ noted that throughout the relevant period, plaintiff has maintained part-time competitive employment near-substantial gainful activity levels. (Tr. 99). This consistent employment, the ALJ found, is inconsistent with allegations of severe and constant restrictions on plaintiff's daily functions. See Browning v. Sullivan, 958 F.2d 817, 821 (8th Cir. 1992) (stating that the ALJ's finding that plaintiff had worked for several years despite complaining of pain she now claimed disabling demonstrated inconsistency in the record). Her GAF scores ranged between 45 and 60, with most reflecting moderate limitations in function rather than the marked and extreme limitations opined by Dr. Sabapathypillai. Most of the GAF scores at or below 50 were given before her alleged onset date of disability, during which she maintained substantial gainful work activity. See Orrick v. Sullivan, 966 F.2d 368, 370 (8th Cir. 1992) (affirming the ALJ's decision when a plaintiff continued to work for a period of years despite alleged worsening of her conditions); Stickle v. Astrue, No. 08-00787-CV-W-NKL-SSA, 2009 WL 1616602, at *5 (W.D. Mo. June 9, 2009) ("Where an individual has worked with an impairment over a period of years, absent significant deterioration, it cannot be considered disabling at present.").

As of October 2013, plaintiff was dressing well and actively seeking work in the community, had started a new relationship, and was assigned a GAF score of 56. (Tr. 1065–68). The record indicates that plaintiff's extreme episodes of depression and grief and lower GAF scores were related to her son's suicide and situational stressors such as her boyfriend being in jail and financial problems.

Those episodes of severe depression were relatively short-lived, and the ALJ drew the overall impression from the evidence that plaintiff had moderate mental limitations and could sustain work that was not detailed or complex and did not require substantial social contact. As such, substantial evidence in the record supports the ALJ's finding of inconsistency and determination to afford little weight to Dr. Sabapathypillai's opinion. See Bradley v. Astrue, 528 F.3d 1113, 1115 (8th Cir. 2008) ("We will not disturb the denial of benefits so long as the ALJ's decision falls within the available zone of choice.") (internal quotations omitted); Reutter ex rel. Reutter v. Barnhart, 372 F.3d 946, 950 (8th Cir. 2004) ("Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the decision.").

Plaintiff argues that the ALJ misunderstood her testimony regarding Dr. Sabapathypillai's knowledge of her work status and no evidence suggests that Dr. Sabapathypillai was unaware that plaintiff worked part-time on a sustained basis since the alleged onset date of disability. The Commissioner responds that the record was unclear as to whether Dr. Sabapathypillai understood or was aware that plaintiff had been working part-time on a sustained basis. In either event, substantial evidence supports the ALJ's determination that Dr. Sabapathypillai's opinion was inconsistent with the medical evidence in the record as a whole and plaintiff's daily level of functioning. See Anderson v. Astrue, 696 F.3d 790, 794 (8th Cir. 2012) (affirming the ALJ's determination to afford minimal weight to a treating physician when the doctor expressed significant limitations in his evaluation that were not reflected in any treatment notes or medical records and were inconsistent with the limitations plaintiff actually exhibited in her daily living);

Tellez v. Barnhart, 403 F.3d 953, 956 (8th Cir. 2005) ("[T]he reports of her actual behavior in the workplace were clearly at odds with the extreme limitations described by her psychiatrist and nurse practitioner."); see also Goff, 421 F.3d at 790–91 ("[A]n appropriate finding of inconsistency with other evidence alone is sufficient to discount the [treating physician's] opinion.").

## B.    The RFC Determination

Plaintiff also argues that the ALJ's RFC determination is not supported by substantial evidence in the record. By giving little weight to Dr. Sabapathypillai's opinion, plaintiff argues, no other evidence remains that addresses her mental, work-related, functional impairments for an RFC assessment. However, while the ALJ gave Dr. Sabapathypillai's little weight, he did not discount the doctor's opinion entirely. Cf. Wildman v. Astrue, 596 F.3d 959, 969 (8th Cir. 2010) ("[T]he ALJ was not obligated to include limitations from opinions he properly disregarded."). Rather, the ALJ's finding that plaintiff had moderate limitations which allowed her to engage in simple, repetitive work tasks with only superficial contact with the public and co-workers is supported by Dr. Sabapathypillai's treatment notes and GAF scores. (Tr. 660–64, 713–14, 799–801, 994–97, 1065–68, 1092–96). In considering the severity of plaintiff's alleged mental impairments for the RFC determination, the ALJ deemed plaintiff's statements partially credible. (Tr. 97–98). The ALJ noted that plaintiff had no significant problems with overall social functioning, but her anxiety symptoms would probably cause some difficulty dealing with the public and strangers. (Tr. 95). With respect to plaintiff's concentration, persistence and pace, the ALJ found plaintiff's anxiety attacks and depressed mood

40

reduced her ability to concentrate and think to a moderate degree that allowed plaintiff to perform simple tasks on a sustained basis. (Tr. 96).

After reviewing the evidence in the record as a whole, the ALJ found that plaintiff's episodes of severe depression were relatively short-lived and plaintiff had moderate mental limitations that allowed her to sustain work that was not detailed or complex and did not require substantial social contact. (Tr. 99). These cited limitations are consistent with the RFC assessment and substantial evidence in the record. As such, the ALJ's RFC determination was properly based upon plaintiff's credible allegations, some weight to the medical opinion, and other evidence in the record. See McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000) ("The Commissioner must determine a claimant's RFC based on all the relevant evidence, including the medical records, observations of treating physicians and others, and an individual's own description of his limitations.").

## VI.    Conclusion

For the reasons discussed above, the Court finds that the Commissioner's decision is supported by substantial evidence in the record as a whole.

Accordingly,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is **affirmed**.

.

_____
CAROL E. JACKSON
UNITED STATES DISTRICT JUDGE

Dated this 2nd day of September, 2016.